IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

TIMOTHY L. VAN BUREN SR.,    )
    )
        Plaintiff,    )        4:06CV3295
    )
        v.    )
    )    **MEMORANDUM**
BURLINGTON NORTHERN    )    **AND ORDER**
SANTA FE RAILWAY COMPANY,  )
A Corporation,    )
    )
        Defendant.    )

Timothy Van Buren's pickup collided with a Burlington Northern Santa Fe Railway ("BNSF") train at a railroad crossing. BNSF filed an earlier motion for summary judgment shortly before the President signed a law amending the relevant preemption statute, 49 U.S.C. § 20106. Because BNSF addressed the amendment to the preemption statute only in its reply brief, and for additional reasons explained in an October 24, 2007 order (filing 99), I denied that first motion for summary judgment and gave BNSF leave to file a second motion for summary judgment.

BNSF has filed a second motion for summary judgment (filing 103), and that fully briefed motion is before me for decision. For the reasons explained below, I deny summary judgment as to the claim that BNSF was negligent because its crew failed to sound the horn and grant summary judgment as to all other specifications of negligence.

## I. BACKGROUND

There are four specifications of negligence. Over time, Plaintiff's specifications of negligence have changed in whole or in part. At the time I denied the earlier motion for summary judgment, and after conferring with the lawyers, I

clarified and limited the specifications of negligence so the parties and I would not be required to deal with a "moving target."[1]  (*See* Filing 99.)  My order provided as follows:

> The specifications of negligence that will govern the progression of this case are these and only these, to wit:
>
> A.    Failure of the BNSF crew to sound the horn;
>
> B.    BNSF allowing a farmer to grow corn on land *adjacent to the crossing* in such away [sic] as to partially or fully obstruct the line of sight of the plaintiff regarding his ability to observe the train as he approached the crossing;
>
> C.    Failure of the BNSF crew to keep a proper lookout and timely apply the brakes; [and]
>
> D.    Failure of BNSF to follow *its own policy* regarding vegetation growth.

(Filing 99 (emphasis added).)

The general background is this.  On June 27, 2006, Van Buren ("Plaintiff") and a passenger, Vicky Wilson, were traveling eastbound on County Road T (which travels due east and west), near Leshara, in rural Nebraska.  A railroad track which runs from southeast to northwest intersects County Road T (the "Leshara crossing).

---

[1]That is, under Federal Rule of Civil Procedure 16(c) (and otherwise), I exercised my discretion, after first consulting the lawyers, to clarify and then specify the plaintiff's negligence claims.  *See*, *e.g.*, *Porter-Cooper v. Dalkon Shield Claimants Trust*, 49 F.3d 1285, 1286 (8th Cir. 1995) (Rule 16(c) was properly used to narrow the plaintiff's issues and evidence in product liability case).  Had I not done so, a fair resolution of the summary judgment motion would have been impossible and the resulting trial would have been a farce.

A row of trees on the south side of County Road T stops at the long driveway of a home (the Cody house).  The driveway to the Cody house is about 180 feet from the railroad crossing.  Plaintiff's vehicle collided with Defendant's northwest-bound train at the Leshara, Nebraska crossing.  An aerial photograph shows the stand of trees, the driveway to the Cody house, the Cody house, and the Leshara crossing.  (Filing 106-7, Ex. 7 to Van Buren Dep.)  That photograph is helpful background to the facts set forth below.

The parties identified over 100 facts which they describe as material. Though most are undisputed, I include only those facts necessary for resolution of the summary judgment motion.  The numbering is mine and not that of the parties.

1.      On a clear and dry summer afternoon, June 27, 2006, BNSF Engineer Mark Cole ("Cole"), along with Conductor Mark Schrader ("Schrader") and Conductor Trainee Matt Nietfeld ("Nietfeld") (collectively "the train crew") were taking a train northbound on a track that passes through Leshara, Nebraska.  (Filing 106-47, Cole Aff. ¶ 2.)

2.      On that day, Van Buren and his girlfriend Vicky Wilson were traveling along County Road T  so that Wilson could see the house their friends, the Codys, were completing ("the Cody house") on the south side of County Road T and immediately west of the crossing involved in this case, the "Leshara crossing." (Filing 106-3, Van Buren Dep. 67:1-68:9, 107:20-108:13; Filing 106-6, Ex. 7 to Van Buren Dep.)

*Van Buren's Approach to the Crossing*

3.      On Van Buren's approach along County Road T, the Cody house was obstructed from his view by a row of trees on the south side of the road that ended at the driveway to the Cody house.  (Filing 106-3, Van Buren Dep. 106:13-22; Filing 106-6, Ex. 7 to Van Buren Dep.)  As Van Buren drove alongside the tree line, his

-3-

pickup truck was traveling at under ten miles per hour and slowing down.  (Filing 106-3, Van Buren Dep. 147:21-148:6.)

4.      When they reached the driveway to the Cody house (about 180 feet from the Leshara crossing), Van Buren slowed the truck to "five miles per hour or less" to allow Wilson to turn and look at the house through the back window of the truck. (Filing 106-3, Van Buren Dep. 107:1-15, 109:15-21, 115:22-116:1, 148:7-11.)[2] Van Buren glanced back too.  (*Id.* at 107:8-11, 109:8-18; Filing 106-6, Ex. 7 to Van Buren Dep.)

5.      When asked "how long would it take for you to stop [your] truck if you wanted to at 5 miles an hour," Van Buren replied "[o]h, at 5 miles an hour, probably less than 10 feet."  (Filing 106-3, Van Buren Dep. 109:24-110:2.)

6.      Van Buren stated that between the drive to the Cody house and the Leshara crossing he was "going no faster than 5 miles an hour" and was "slowing down."  (Filing 106-3, Van Buren Dep. 116:2-5.)  From the point marked with a red "X" on Exhibit 7 to his deposition, Van Buren took his "foot off the accelerator and was applying a little bit of brake."  (Id. at 134:7-18; Filing 106-6, Ex. 7 to Van Buren Dep.)

7.      Just after passing the Cody house driveway, Van Buren looked to the south (his right) and saw the corn field.  (Filing 106-3, Van Buren Dep. 118:24-119:10; Filing 106-6, Ex. 7 to Van Buren Dep.)  Van Buren stated that he "couldn't see if there was a train on the tracks," could not "see the tracks at all," and "couldn't see a train."  (Filing 106-3, Van Buren Dep. 119:11-17.)

---

[2]Plaintiff specifically admitted that the driveway to the Cody house is about 180 feet from the Leshara crossing.  (Filing 108, Br. in Opp'n. to D.'s Mot. for Summ. J. (hereinafter "P.'s Br.") at page 4, ¶ 8.)

8.      Van Buren marked an "X" on a photograph of the crossing at some point between the Cody house driveway and the westernmost rail of the tracks.  (Filing 106-7, Ex. 11 to Van Buren Dep.)  Van Buren noted that at the point marked by the "X," he looked left first and then right.  (Filing 106-3, Van Buren Dep 162:5-20.)  He also stated that if instead of looking left first he "would have looked south [right] first, yes, I probably would have had time to stop."  (*Id.* at 163:18-19.)  The actual distance between the "X" and the closest rail of the track is unclear.[3]

9.      At the point where he marked the X on Exhibit 11 and when he approached the westernmost rail of the track, Van Buren was traveling three to four miles per hour.  (Filing 106-3, Van Buren Dep. 111:1-13; 163:2-5.)  When asked how long it would take to stop his truck while traveling 3 or 4 miles an hour, Van Buren replied "[w]ithin 5, 6 feet I suppose or less."  (Id. at 111:14-17.)

10.     As he had "[j]ust started" to "go[]over the rails," Van Buren looked to the south (right) and saw BNSF's train.  (Filing 106-3, Van Buren Dep. 124:6-8.)

11.     Seeing and hearing the train at that point, Van Buren said to Wilson "there's a train," and attempted, unsuccessfully, to reverse his truck off of the tracks. (Filing 106-3, Van Buren Dep. 124:0-22.)

*Train Crew's Perception of Van Buren's Approach*

12.     BNSF Conductor Mike Schrader first observed Van Buren's truck "breaking through the holes in that tree line" west of the Leshara crossing.  (Filing 106-11, Schrader Dep. 65:22-66:2; Filing 106-6, Ex. 7 to Van Buren Dep.; Filing

---

[3]BNSF Claims Manager Patricia Heather estimated this distance, but her estimate may not be accurate.

106-9, Ex. 15 to Van Buren Dep.)  He "could see [Van Buren's truck] through the holes in the tree line."  (Filing 106-11, Schrader Dep. 66:3-4, 18-21.)  At that point, the train was at or near the whistle post–"it was right in there somewhere[.]" ( *Id.* at 72:16-73:3.)

13.     While he did not "concentrate" on Van Buren's truck,  Schrader "knew he was there."  (*Id.* at 67:1.)  When asked if he maintained a "constant view" of Plaintiff, Schrader replied:  "Enough to know–I followed him down the hill, but as I'm looking back and forth to the engineer and discussing the situation, there's probably instances where I took my eyes off him."  (*Id.* at 68:4-8.)

14.     When asked to explain his discussion with Engineer Mark Cole regarding "the situation" of Van Buren not being able to see the train due to the tree line, Schrader stated as follows:

Q.     What did you and Mr. Cole talk about?
A.     When I saw him in the tree line, I mentioned I don't think he sees us.
Q.     Why is it you said I don't think he sees us?
A.     Because the trees were blocking.

(*Id.* at 68:6, 13-18.)  Cole explained "I can't remember exactly what we said, but we were–we knew he was there."  (Filing 106-12, Cole Dep. 53:14-15.)

15.     Conductor Schrader again observed Van Buren's truck when it emerged from the tree line.  (Filing 106-11, Schrader Dep. 70:3-5.)

16.     Schrader observed that Van Buren's truck "was going so slow, I don't know why he wouldn't have stopped."  (*Id.* at 83:11-12.)  In fact, Plaintiff appeared to be a cautious driver approaching the crossing to come to a stop and wait for the train: "[H]e was traveling real slow to begin with," "slowing down," and "at the very

-6-

end he was going real slow." (*Id.* at 84:3-10.) Unfortunately, "at the very end," he "just kept on going." (*Id.*) It did not appear to Schrader to be an emergency situation or imminent collision "until the very end"–"just right before impact." (*Id.* 84:25-85:14.)[4]

17.     Engineer Cole remembers first seeing Van Buren's truck when the train was "[e]ither right before or right after the whistle post[,]" about "a quarter of a mile" from the crossing. (Filing 106-12, Cole Dep. 47:7-25.) He could see Van Buren's truck through "a gap in between these trees that we could see him coming through." (*Id.* at 49:1-12; Filing 106-6, Ex. 7 to Van Buren Dep.)

18.     After Van Buren's truck emerged from the tree line, Engineer Cole also visually followed it all along County Road T to the Leshara crossing without losing sight of the truck. (Filing 106-12, Cole Dep. 50:25-14.) Cole did not have any difficulty seeing Van Buren's truck once it emerged from the tree line about 200 feet shy of the crossing–"Seen him perfect." (*Id.* at 51:12-14; *see also*, *id.* at 52:5 ("you could see him clear"), 74:8-9 ("If I could see him, I'm assuming that he could see us."); 74:13-15 ("I don't know how tall the corn was, but I could see his whole pickup. I could see his wheels and everything.").)

19.     Cole testified that when he first observed Van Buren's truck, the truck was traveling "slow enough that on hot summer days he's not kicking up dust off a dirt road. Really slow. Less than five miles per hour, I suppose." (Filing 106-12, Cole Dep. 57:11-13.)

20.     In an exchange between Cole and Plaintiff's counsel, Cole answered counsel's questions as to whether Cole believed Plaintiff would stop as follows:

_____

[4]Plaintiff specifically admitted these facts. (Filing 108, P.'s Br. at page 9, ¶ 21.)

> Q.    Now, when you first saw [Plaintiff], did you think he was going
>        to stop at the crossing?
> A.    I don't know what I was thinking a year ago, but at the time I
>        guess–guess thinking about it, I was thinking he could have
>        stopped at anytime he wanted.  He was going so slow that it
>        wasn't an issue.
> Q.    Are you telling me here today that you thought he was going to
>        stop?
> A.    Yah.  He could have stopped at any time, but I'm not him, so I
>        don't know if he was going to stop or not."

(Filing 106-12, Cole Dep. 57:18-58:5.)

21.    Only "seconds" elapsed from the time the train crew first observed Van Buren's truck until impact:

> Q.    How much time elapsed from the time you would have first seen
>        him up to the time of the collision?
> A.    I don't know exact times, but seconds.  Quick.

(Filing 106-12, Cole Dep. at 60:2-6.)

22.    Going 45-47 miles per hour, the BNSF train was moving quickly at 66-69 feet per second.  There are 1323 feet from the whistlepost to the crossing.  The train speed was well below the maximum speed allowed for Class IV track and within the restrictions set by BNSF's timetable for that subdivision. [5]

23.    When Van Buren's truck began crossing the tracks, Engineer Cole applied the emergency brakes on the BNSF train.  (Filing 106-47, Cole Aff. ¶ 6; Filing 106-12, Cole Dep. 40:20-22, 63:1-17, 71:23-72:14, 72:24-73:3.)

---

[5]Plaintiff specifically admitted these facts.  (Filing 108, P.'s Br. at page 11, ¶28.)

-8-

24.     At, or shortly after the whistle post, the crew discussed the fact they did not think Tim Van Buren saw the train due to the trees.  (Filing 106-11, Schrader Dep. 68:14-18, 69:4-16.)  Schrader did not consider the situation an "emergency" and did not consider slowing the train down, until "the very end," just "right before impact."  (*Id.* at 85:2-23.)  Cole did not "consider slowing the train down at all before [the train] got to the crossing," as he could see Van Buren and believed Van Buren "could have stopped" as he was going so slow.  (Filing 106-12, Cole Dep. 73:17-22, 55:11-13.)

25.     The BNSF train struck the passenger side of the truck.  (Filing 106-12, Cole Dep. 66:13-23.)  Even with emergency braking applied it took the train well over one-quarter of a mile to come to a complete stop.  (*Id.* at 28:14-29:16; Filing 106-43, Hankins Aff. ¶7(e).)

*BNSF Engineering Instructions for Vegetation*

26.     Defendant's Engineering Instruction for vegetation maintenance at grade crossings was not created pursuant to the Federal Rail Safety Act (Title 49 of the United States Code) nor pursuant to any order by the Secretary of Transportation of Homeland Security.  (Filing 106-51, Van Hook Aff. ¶¶ 4-6.)

*Post-Accident Investigation*

27.     BNSF Claims Manager Patricia Heather ("Heather") arrived on the scene of the accident on the day of the accident, June 27, 2006, and took several photographs then and during the days following of both the Leshara crossing and surrounding area.  (Filing 105-19, Heather Aff. ¶¶ 3, 5; Filings 105-20 to 105-33, Ex.'s A through N to Heather Aff.)  The corn had not been cut when the photographs were taken.  Heather stated that the photographs attached as exhibits to her affidavit

fairly and accurately depict the crossing, the train, crossbucks, tracks, and surrounding topography and advanced warning signs in existence at the time the photographs were taken . . . . Although certain photographs (Exhibits B, D, and E through L [to her affidavit]) were taken a couple days to a week after the accident, I observed all objects appearing in said photographs on the date of the accident and hereby state and represent that the objects depicted in said photographs appear as they did on the day of the accident.

(Filing 105-19, Heather Aff. ¶ 5.)

28.    The Heather photographs were taken from an eye-height of 65.75 inches which was substantially similar to the 64.4 inches eye-height of Van Buren as he was sitting in his truck. (Filing 105-19, Heather Aff. ¶ 4; Filing 106-3, Van Buren Dep. 127:17-129:15.)[6]

29.    The Heather photographs show the visibility of the railroad tracks above and through the corn, the unobstructed advance warning sign and the unobstructed crossbucks at the crossing as they existed on the date of the accident. (Filings 105-21 through 105-33, Ex.'s B through N to Heather Aff.)[7]

30.    Specifically, the Heather photographs show that from the Cody's driveway (about 180 feet from the crossing) up to the crossing, there was a clear view

---

[6]Plaintiff objected to this statement on lack of foundation. I find it admissible, as Heather stated the height at which the photographs were taken, Van Buren indicated his eye-height while seated in the truck, and Heather stated that the photographs, though taken after the accident, depicted the conditions she saw on the day of the accident when she arrived at the scene.

[7]I reject Plaintiff's foundational objection to this statement. Paragraph 5 of the Heather Affidavit (Filing 105-19), described in Statement of Fact ("SOF") No. 27, provides adequate foundation for this statement.

of the two locomotives and train from a viewpoint on County Road T. (Filing 105-19, Heather Aff. ¶¶ 8-16; Filing 105-22, Ex. C to Heather Aff. (no vegetation on or immediately adjacent to the railbed on the evening of the accident); Filings 105-23 & 105-24, Ex.'s. D & E to Heather Aff. (no visual obstructions at 117 feet from crossing two days after accident); Filings 105-25 & 105-26, Ex.'s. F & G to Heather Aff. (no visual obstructions at 184 feet from crossing two days after accident); Filings 105-27 & 105-28, Ex.'s. H & I to Heather Aff. (no visual obstructions within a few feet of the crossing two days after accident or two weeks after accident); Filings 105-29 to 105-31, Ex.'s. J-L to Heather Aff. (train in view clearly visible above the corn at 184 to 200 feet from the crossing one week after accident); and Filings 105-32 & 105-33, Ex.'s. M & N (no visual obstructions at 75 feet from the crossing one week after the accident).)

31.     Plaintiff stated that he observed the unobstructed advanced warning sign and crossbucks on his approach to the Leshara crossing. (Filing 106-3, Van Buren Dep. 94:16-24.) Plaintiff testified that after he passed the Cody's driveway he looked to the south and could not see a train. (Filing 106-3, Van Buren Dep. 119:5-17.)

32.     People living in the area and familiar with the Leshara crossing at the time of the accident did not observe any visual obstructions with the view to the right (south) from the perspective of a driver on County Road T traveling east. (Filing 106-7, Matteson Dep. 33:1-37:6; Filing 106-15, Gana Dep. 22:8-14; Filing 106-52, Foust Aff. ¶¶ 4,6; Filing 106-13, Feist Dep. 59:1-60:24; and Filing 106-15, Ex. 1 to Feist Dep.)[8]

---

[8]Plaintiff specifically admitted this statement of fact. (Filing 108, P.'s Br. at 22-23, ¶ 61.)

*Sounding of the Horn or Whistle*

33.    Engineer Cole asserts that he began sounding the horn in the usual pattern "[a]t the whistle post where [he's] required to."  (Filing 106-12, Cole Dep. 53:25-54:6.)  He asserts that he continued to sound the horn until the locomotive entered the crossing.  (Filing 106-47, Cole Aff. ¶6.)

34.    Schrader testified that the whistle and horn were activated "very shortly" after first seeing Van Buren's truck.  (Filing 106-11, Schrader Dep. 72:16-19.)

35.    "The magnetic tape type of event recorder on the lead locomotive was . . . incapable of recording a whistle or horn being engaged . . . ."  (Filing 106-43, Hankin Aff. ¶7(a).)

36.    Plaintiff stated that at about the point of the Cody driveway, he listened for but did not hear a train.  (Filing 106-3, Van Buren Dep. 119:8-21.)

37.    David Feist has testified that on the date of the accident he was working with Brett Gana in a field, approximately 700 feet northeast of the crossing, with a skid loader running right beside them.  (Filing 109-7, Feist Dep. 22:3-19.)  Both Feist and Gana have testified that they did not hear a whistle or horn.  (*Id.* 24:12-13; 35:4-6; Filing 109-8, Gana Dep. 19:3-4.)

38.    Gana has testified that the day after the accident, he was again working in that same field, with the skid loader running, and states that he heard a train whistle as it approached the crossing where the accident occurred.  (Filing 109-8, Gana Dep. 19:18-20:16).[9]

---

[9]I reject Defendant's foundational objection to this statement.

-12-

39.     According to both Feist and Gana, when a train traveling on this track sounds its horn or whistle, the warning is loud.  (Filing 109-7, Feist Dep. 77:20-78:9; Filing 109-8, Gana Dep. 24:23-25:4.)

## II.  ANALYSIS

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c). "While a court must view the evidence 'in the light most favorable to the nonmoving party' . . . the nonmoving party 'must present more than a scintilla of evidence and must advance specific facts to create a genuine issue of material fact for trial.'" *Williams v. City of Carl Junction,* 480 F.3d 871, 873 (8th Cir. 2007) (internal citation omitted).  "The nonmoving party is entitled to all reasonable inferences that may be drawn from the evidence but not to inferences that may only be drawn by 'resort[ing] to speculation.'"  *Id.* (internal citation omitted).

Defendant asserts that all of Plaintiff's claims are preempted by 49 U.S.C. § 20106.  I turn to analysis of that statute, and then apply it to the specifications of negligence.

### *PREEMPTION*

The relevant preemption statute provides as follows:

(a)     National uniformity of regulation.
(1)     Laws, regulations, and orders related to railroad safety and laws, regulations, and orders related to railroad security shall be nationally uniform to the extent practicable.
(2)     A State may adopt or continue in force a law, regulation, or order related to railroad safety or security until the Secretary of Transportation (with respect to railroad safety

matters), or the Secretary of Homeland Security (with respect to railroad security matters), prescribes a regulation or issues an order ***covering*** the subject matter of the State requirement. A State may adopt or continue in force an additional or more stringent law, regulation, or order related to railroad safety or security when the law, regulation, or order–

      (A)   is necessary to eliminate or reduce an ***essentially local safety or security hazard***;

      (B)   is not incompatible with a law, regulation, or order of the United States Government; and

      (C)   does not unreasonably burden interstate commerce.

(b)    Clarification regarding State law causes of action.

(1)    Nothing in this section shall be construed to preempt an action under State law seeking damages for personal injury, death, or property damage alleging that a party–

      (A)   has failed to comply with the Federal standard of care established by a regulation or order issued by the Secretary of Transportation (with respect to railroad safety matters), or the Secretary of Homeland Security (with respect to railroad security matters), covering the subject matter as provided in subsection (a) of this section;

      (B)   has failed to comply with its own plan, rule, or standard that it created ***pursuant to a regulation or order issued by either of the Secretaries***; or

      (C)   has failed to comply with a State law, regulation, or  order that is not incompatible with subsection (a)(2).

(2)    This subsection shall apply to all pending State law causes of action arising from events or activities occurring on or after January 18, 2002.

(c)    Jurisdiction.–Nothing in this section creates a Federal cause of action on behalf of an injured party or confers Federal question jurisdiction for such State law causes of action.

49 U.S.C.A. § 20106 (emphasis added).

-14-

On August 3, 2007, Congress enacted the Implementing Regulations of the 9/11 Commission Act of 2007, Pub. L. 110-53, 121 Stat. 266.  Among other things, the 2007 legislation amended 49 U.S.C. § 20106.  It retained the text of the prior version of the statute but redesignated it as subsection (a).  It also added new subsections (b) and (c).  Pub. L. 110-53, Title VI, § 1528 (August 3, 2007).  Section 20106 was not amended to eliminate preemption of federal claims, but rather

> to rectify a situation in which two federal courts, both of which decided cases arising from the same train derailment accident occurring at Minot, North Dakota on January 18, 2002,[10] concluded that a railroad's violation of federal standards of care was not relevant to a preemption analysis.  *See* H.R. Rep. No. 110-259, at 351 (2007) (Conf. Rep.). Those cases are *Mehl v. Canadian Pac. Ry.*, 417 F. Supp. 2d 1104 (D.N.D. 2006) and *Lundeen v. Canadian Pac. Ry.*, 507 F. Supp. 2d 1006 (D. Minn. 2007).  Congress responded by clarifying that a state law cause of action is not preempted when it is based on an allegation that a party failed to comply with a federal standard of care established by regulation or failed to comply with its own plan, rule or standard created pursuant to a federal regulation.

*Mastrocola v. Southeastern Penn. Transp. Auth.*, 941 A.2d 81, 90 n.12 (Pa. Commw. Ct. 2008).

After amendment of section 20106, the familiar preemption analysis of *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658 (1993)[11], *Norfolk S. Ry. Co. v. Shanklin*,

---

[10]This is the effective date of 49 U.S.C. § 20106(b).

[11]Section 20106(a) is worded slightly differently but is identical in substance to the preemption clause discussed in *Easterwood*.  *See In re Derailment Cases*, 416 F.3d 787, 793 n.5 (8th Cir. 2005) (provisions of section 20106 then in effect was worded slightly differently from but identical in substance to version examined in *Easterwood*); 49 U.S.C.A. § 20106 (2007) (historical and statutory notes reflecting no amendment of the statute between 2002 and the 2007 edition of chapter 49 of

529 U.S. 344 (2000), and their progeny is applied to allegations of state law negligence, *unless*:  (1) the negligence involves a railroad's *failure* to comply with a federal standard of care and section 20106(b)(1)(A) applies or (2) the negligence involves a railroad's *failure* to comply with its own plan, rule, or standard created pursuant to a federal regulation and section 20106(b)(1)(B)applies.   Section 20106(b)(1)(C), which provides that "[n]othing in this section shall be construed to preeempt" a State law action alleging that a party has "failed to comply with a State law, regulation, or order *that is not incompatible with subsection (a)(2)*," merely restates the general preemption rule and the exception found within section 20106(a)(2).

Generally, state law negligence claims are preempted by what is now section 20106(a) if federal regulations "cover" the same subject matter, which requires that the federal regulations "substantially subsume" the subject matter of the relevant state law.  *See, e.g., Easterwood*, 507 U.S. at 664 (state common law falls within the broad category of laws relating to railroad safety and federal regulations must "substantially subsume" relevant state law to have preemptive effect); *Shanklin*, 529 U.S. at 357-58.

### *SOUNDING THE HORN*

Federal regulations specify when a locomotive must sound its horn.  49 C.F.R. §§ 222.21, 222.23.  The parties agree that whether the claim that Defendant failed to sound the horn is preempted depends upon a factual predicate.  If the crew failed to sound the horn, then Plaintiff's claim of negligence based on failure to sound the horn in accordance with the federal regulations is not preempted under 49 U.S.C. § 20106(b)(1)(A).  (Filing 104, Br. in Supp. of D.'s Mot. for Summ. J., at 37; Filing 108, P'.s Br. at 37-38.)  Plaintiff's response to the motion for summary judgment is internally inconsistent on this critical point.

---

U.S.C.A).

-16-

Plaintiff responded to Defendant's statement of facts by repeating each statement of fact submitted by Defendant and by responding "Admit" or by asserting that the fact was controverted (sometimes, but not always, including a pinpoint citation to the record). Plaintiff also provided a statement of additional facts which he asserts are undisputed. Plaintiff specifically *admitted* Defendant's statement of fact nos. 20 (Conductor Schrader heard Cole sound the train horn) and 24 (Engineer Cole began sounding the horn at the whistlepost and continued to sound it until the locomotive entered the crossing). (Filing 108, P.'s Br. at 9-10.) However, other responses in Plaintiff's brief and the additional facts submitted by Plaintiff indicate that Plaintiff *disputes* whether the horn was sounded. Plaintiff denied Defendant's statement that "the horn and bell sounded when activated," with this explanation:

> By way of deposition testimony and affidavit, Defendant has argued that it complied with 49 C.F.R. § 222.21, 222.21(B)(2) and 222.23 regarding the sounding of the locomotive horn. However, Plaintiff argues that *the deposition testimony* of individuals involved in the collision, and those in close proximity to the crossing at the time of the collision, creates a question of fact as to whether the horn and bell were sounded.

(Filing 108, P.'s Br. at 3-4 (emphasis added).)[12] Plaintiff also submitted additional statements of fact relevant to whether the horn sounded. (Filing 108 at 25 - 26 (additional "facts" numbered 71, 80, and 81).) Finally, Plaintiff argued that the evidence "creates a question of fact as to whether Defendant's train crew sounded the horn." (*Id.* at 39.) The brief went on to describe the testimony of Plaintiff, Feist, and

---

[12]Local rules require that a response objecting to the movant's statement of facts must be *concise* and contain pinpoint citations to the record. NECivR 56.1(b)(1). Plaintiff's brief states that a fact is in dispute based on "deposition testimony," but does not provide pinpoint citations to that testimony until more than twenty pages later in his brief. This is not a concise response. Plaintiff's counsel could and should have done better.

-17-

Gana (and others), with pinpoint citation to the portions of their depositions creating a question of fact as to whether the horn sounded. (*Id.* at 39-40.)

I find that there is a question of fact as to whether the horn was sounded. The conductor and engineer stated in their depositions that the horn was sounded. The train was not equipped with an event recorder that would resolve the question (and Plaintiff should not attempt to draw any negative inferences from the absence of an event recorder).[13] Plaintiff stated that he listened for a train at or near the Cody house driveway (which is 180 feet from the crossing) and did not hear a horn. (Statement of Fact ("SOF") 36.) On the day of the collision and at the time of the collision, Feist and Gana were in a cornfield 700 feet north of the crossing working with loud machinery (a skid loader) next to them. They each stated that they did not hear a train whistle or horn. (SOF 37.) Significantly, Gana stated that on the day *following* the collision, working in the same field with the same machinery running, he heard a train whistle as it approached the crossing. (SOF 38). This indicates that Gana was so situated that he would have heard the horn on the day of the collision if it had sounded. Despite Defendant's protestations about "positive" and "negative" evidence, the fact that Gana did not hear the horn prior to the collision but did hear the horn on the following day, combined with the statements of Van Buren and his passenger that they did not hear the horn, is sufficient to create a question of fact as to whether the horn was sounded prior to the collision. *Security First Bank v. Burlington N. & Santa Fe Ry. Co.*, 213 F. Supp. 2d 1087, 1091 (D. Neb. 2002) (testimony of passenger injured in crossing collision with train that he did not hear a train horn, together with affidavit of neighbor that the whistle did not blow and information to support neighbor's conclusion that if there had been a whistle she would have heard it, created question of fact precluding summary judgment).

---

[13]Plaintiff's brief suggests that the statements of the conductor and engineer regarding the horn should be discredited because the train was not equipped with an event recorder. (Filing 108, P.'s Br. at 39.)

-18-

*CORN BLOCKING VIEW OF ONCOMING TRAIN*

I earlier limited the specification of negligence regarding the claim that corn blocked Van Buren's view of a train coming from the south. I stated that this claim would be limited to the following specification of negligence:

> BNSF allowing a farmer to grow corn on land *adjacent to the crossing* in such away [sic] as to partially or fully obstruct the line of sight of the plaintiff regarding his ability to observe the train as he approached the crossing . . . .

(Filing 99 at 2 (emphasis added).) Plaintiff has recharacterized his claim regarding obstruction of the sight line of the oncoming train. He formerly claimed that corn adjacent to the tracks and crossing blocked his view.[14] However, in responding to the motion for summary judgment, Plaintiff stated that his "claims regarding vegetation and obstruction of view are not limited to the crossing and the area immediately adjacent to the railroad tracks. Rather, Van Buren's claims that the Defendant was negligent *focuses on the property owned and controlled by the Defendant in the southeast quadrant of the crossing in question*."[15]   (Filing 108, P.'s Br. at 43 (emphasis added).) Plaintiff's brief goes on to clarify that the corn in question is *"on the right-of-way, but not immediately adjacent to the tracks*." (*Id*. at 44.) The claim that Defendant was negligent for permitting corn in the right of way but not adjacent to the tracks to obstruct the view of trains approaching the crossing from the south

---

[14]This claim would have been preempted because federal regulations govern vegetation on or immediately adjacent to the railbed. *Peters v Union Pac. R.R. Co.*, 455 F. Supp. 2d 998, 1003 (W.D. Mo. 2006) (49 C.F.R. § 213.37 "preempts state regulation of vegetation on or immediately adjacent to the tracks") (citing cases).

[15]This is the relevant quadrant for the collision of a northwest-bound train and an east-bound vehicle.

claim fails because it is outside the specifications of negligence permitted by my prior order.

Even if I permitted this newest iteration of the vegetation claim, it fails. Like the claim in *Security First* (also involving a claim that a motorist's view of an oncoming train was obstructed by vegetation), the current iteration of Plaintiff's obstructed line of sight claim fails, without regard to preemption, because photographs taken immediately following the accident "do not show any vegetation within the right of way that would have prevented [the plaintiff] from seeing the train." *Security First*, 213 F. Supp. 2d at 1092. Defendant's claims adjuster, Heather, took photographs following the accident and before the corn in the right of way was cut. (SOF 27.) The Heather photographs taken from the center of County Road T were taken from an eye-height of 65.75 inches. Plaintiff estimates that his eye level when seated in his pickup was 64.4 inches–less than 1.5 inches lower than the view of the heather photographs. (SOF 28.) Exhibits J and K to the Heather affidavit are photographs taken one week after the accident, at 180 and 200 feet from the Leshara crossing, which is after the tree line ended and before the Cody house driveway. (SOF 30; Filings 105-29 and 105-30, Ex.'s J and K to Heather Aff.) These photographs clearly show that the view of an oncoming train would not be obstructed, as even the tracks are largely visible and the engine is substantially higher than the tracks. Other Heather photographs similarly show that corn did not obstruct the view of the oncoming train. (SOF 30.) Furthermore, Plaitiff specifically admitted that "[p]eople living in the area and familiar with the Leshara crossing at the time of the accident did not observe any visual obstructions with the view to the right (south) from the perspective of a driver on County Road T traveling east." (SOF 32.)

Plaintiff attempts to create a question of fact by offering other photographs, a topographical survey by David Neef, and the opinion of William Berg, Ph.D. This evidence does not create a question of fact in light of the Heather photographs clearly indicating an unobstructed view at the time in question. More specifically, Plaintiff's

-20-

photographs were taken on or after July 10, 2006, long after the June 27, 2006 accident, and do not reflect the viewpoint of someone on County Road T looking toward the southwest for oncoming trains.  Neef surveyed cut corn on August 18, 2006, long after the accident, and his measurements of random corn stalks cut more than three weeks after the accident is not probative of whether corn obstructed the relevant view on the date of the accident.  Berg's opinions as to corn blocking the view are based on the Neef survey.

## FAILURE OF BNSF TO FOLLOW ITS OWN POLICY REGARDING VEGETATION GROWTH

This claim fails for multiple reasons.  As I have explained, the photographic evidence establishes that corn did not obstruct the view of oncoming trains. Additionally, this claim is preempted.  Section 20106 permits an action under state law alleging that a railroad was negligent for failing to comply with its own regulation only if that regulation is "created pursuant to a regulation or order issued by either of the Secretaries [of Transportation, regarding safety matters, and of Homeland Security, regarding security matters]."  49 U.S.C. § 20106(b)(1)(B). Plaintiff has clearly admitted that Defendant's vegetation regulation was not created pursuant to a regulation or order of the Secretary of Transportation.  (Filing 108, P.'s Br. at 20 (admitting Defendant's statement of fact no. 54).)  Thus it is preempted.

Plaintiff attempts to avoid preemption by stating that this claim "is not based on federal or state law.  Rather it is based on Defendant's common law duty to clear its property at its crossings."[16]  (Filing 108, P.'s Br. at 53.)  My prior order clarifying

---

[16]Plaintiff does *not* assert that his view of the crossing itself was obstructed. Plaintiff stated in his deposition that he saw the advanced warning sign and the crossbucks.  (Filing 106-3, Van Buren Dep. 94:16-24.)  The photographs show that the view of the crossing is not obstructed. (*See, e.g.*, Filing 105-21 (Ex. B to Heather Aff.); Filing 105-19 at ¶¶5, 7 (the referenced photograph was taken two days after the

and limiting the specifications of negligence did  not list this claim, so it is barred. (*See* Filing 99.)

### FAILURE OF THE BNSF CREW TO KEEP A PROPER LOOKOUT AND TIMELY APPLY THE BRAKES

Federal regulations govern train speed and Plaintiff has admitted that Defendant's train was traveling below the federally-authorized speed limit. (SOF 22.) The claim that Defendant's crew failed to keep a proper lookout and timely apply the brakes is preempted unless the  application of state common law negligence is "necessary to eliminate or reduce an *essentially local safety or security hazard*" and if that law is not incompatible with any federal requirements and does not unreasonably burden interstate commerce. 49 U.S.C. § 20106(a)(2)(emphasis added). Courts have found that an "essentially local safety hazard" within the meaning of what is now section 20106(a)(2) is a "specific, individual hazard."  *See, e.g., Easterwood*, 507 U.S. at 675 n.15 (finding excessive speed claim preempted if train was traveling within the federal speed limit but leaving open the question whether a claim based upon "the duty to slow or stop a train to avoid a *specific, individual hazard*" was preempted) (emphasis added).  "[A] 'specific individual hazard' must be a discrete and truly local hazard . . . ."  *O'Bannon v. Union Pac. Ry. Co.*, 960 F. Supp. 1411, 1420 (W.D. Mo. 1997) (footnote omitted).  The prototypical "specific individual hazard" is a child standing on the track.  *Bashir v. National R.R. Passenger Corp.*, 929 F. Supp. 404, 412 (S. D. Fla. 1997), *aff'd on other grounds*, 119 F.3d 929 (11th Cir. 1997).

Plaintiff argues that the approach of Plaintiff's vehicle toward the tracks was a "specific, individual hazard," citing cases finding that the unwavering approach of a vehicle to a railroad crossing is a specific, individual hazard.  *See, e.g., Peters v.*

---

accident and depicts the view as it appeared on the day of the accident).)

*Union Pacific Ry. Co.*, 455 F. Supp. 2d 998, 1003 (W.D. Mo. 2006); *Alcorn v. Union Pac. R.R. Co.*, 50 S.W. 3d 226 (Mo. 2001) (*en banc*).  Plaintiff claims that the conductor and engineer should have slowed the train at some point past the whistle stop and before the crossing because they "knew" that he did not see the train and was not going to stop.

The approach of a vehicle is not a "specific, individual hazard" unless and until there is imminent danger of the train colliding with the vehicle.  *Alcorn,* 50 S.W. 3d at 242 (if a "train crew knew or should have known, by reason of [a vehicle's] 'unwavering approach,' that a collision was imminent," the unwavering approach of the vehicle constitutes a "specific, individual hazard" and the failure of the crew to slow or stop the train to avoid the collision is not preempted by the federal regulations governing train speed).  In *Alcorn*, the train crew saw the plaintiff's vehicle approaching the crossing "and saw that the car was neither speeding up nor slowing down."  *Id.*  The plaintiff was a passenger in the vehicle, which was traveling approximately thirty miles per hour.  The driver testified that he saw no advance warning devices or crossbucks.  *Id*. at 232.  The crew "knew that the crossing in question was dangerous, based on previous close encounters, as well as [a] fatality several months earlier."  *Id.* at 242.  (The specific facts which indicated the unwavering approach of the vehicle in *Peters* are not reported.)

Plaintiff's approach to the Leshara crossing was materially different from the approach of the vehicle in *Alcorn*.  Prior to the collision, and when he was about 180 feet from the crossing, Plaintiff he was traveling only five miles per hour *and* was slowing down. (SOF 4, 6.)  Plaintiff himself estimated that when traveling five miles per hour, he could have stopped his vehicle in "probably less than 10 feet." (SOF 5.)  By Plaintiff's own testimony, he slowed even further.  As he approached the closest rail of the tracks, he was traveling three or four miles an hour. (SOF 9.)  By contrast, the vehicle in *Alcorn* was traveling thirty miles per hour and was not slowing down.  In the instant case, the train engineer and conductor saw Plaintiff  when they were at

-23-

or near the whistle post, 1323 feet from the crossing.  (SOF 12, 22.)  Although Schrader told Cole he didn't think Plaintiff had seen the train, Cole stated that he thought Plaintiff would stop, because he was going so slow.  (SOF 20.)  *Plaintiff specifically admits* that he appeared to be a "cautious driver approaching the crossing to come to a stop and wait for the train," and that "[i]t did not appear to Schrader to be an emergency situation or imminent collision 'until the very end' – 'just right before impact.  (SOF 16, Filing 108, P.s' Br. at page 9, ¶ 21.)  Under these circumstances, and by Plaintiff's own admission, the train crew had no reason to believe that a collision was imminent until Plaintiff's front tires reached the outermost rail.  At that point, Engineer Cole applied the emergency brakes.  (SOF 29.)  It took well over 1320 feet to stop the train.  (SOF 30.)

The approach of Plaintiff's vehicle toward the Leshara crossing was not a "specific, individual hazard."  The claim that Defendant's crew failed to keep a proper lookout and timely apply the brakes is preempted.

## OTHER SPECIFICATIONS OF NEGLIGENCE

As previously noted, I clarified the specifications of negligence so the parties and I would not be required to deal with a "moving target."  (*See* Filing 99.)  To the extent that Plaintiff has asserted specifications of negligence that are not explicitly discussed in this opinion, I find and conclude that they are barred by my prior order and have been preempted, and thus precluded, by federal law.  As a result, summary judgment is granted for any specifications of negligence not explicitly discussed in this opinion.

-24-

*MOTION IN LIMINE*

Defendant has recently filed a motion in limine.  (Filing 113.)  It appears that the court should defer consideration of this motion until at or about time of trial, unless some reason is shown why earlier consideration is warranted.

### III.  CONCLUSION

For the foregoing reasons,

IT IS ORDERED that:

1.     The motion for summary judgment (filing 103) is *denied* as to the claim that Defendant was negligent for failing to sound the horn and *granted* as to all other specifications of negligence, whether or not they are explicitly discussed in this opinion; and

2.     The motion in limine (filing 113) shall be held in abeyance and not considered until the first day of trial during the pretrial conference which will be held immediately prior to trial, unless a party shall show cause, within 10 days of this order, why such deferral would be inappropriate.

April 8, 2008.                    BY THE COURT:

                                  *s/Richard G. Kopf*
                                  United States District Judge